**In the Matter of Judith L. GORFKLE, Appellant.**

**No. 79–611.**

District of Columbia Court of Appeals.

Submitted Nov. 13, 1980.

Decided April 6, 1982.

---

Alexander L. Benton, Washington, D. C., was on the brief for appellant.

Charles F. C. Ruff, U. S. Atty. at the time of submission, John A. Terry, John R. Fisher, and Richard C. Bicki, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before NEWMAN, Chief Judge, KELLY, Associate Judge, and GALLAGHER,* Associate Judge, Retired.

---

* Judge Gallagher was an Associate Judge of the court at the time the case was submitted. His status changed to Associate Judge, Retired, on February 27, 1981.

GALLAGHER, Associate Judge, Retired:

Appellant, counsel of record in the case of *United States v. Robert O. Chambers*, Cr. No. F3968–78, was held in summary contempt by the presiding judge in that case for her "persistent refusal to comply with the court's reiterated directive that counsel not lead her witness." From that conviction and a fine of $150, appellant brought this appeal. Because we are of the opinion that the conviction is not supported by sufficient evidence, we reverse.

The pertinent communications between Judith Gorfkle and the bench in the two-day jury trial appear to have begun on the first day with Gorfkle's cross-examination of the arresting officer in the case. After establishing that the officer had handcuffed the defendant and that there were others in the vicinity, appellant asked, "And were they—do you recall someone hollering at you, 'Don't treat him like an animal'?" The prosecuting attorney objected, and the court summoned counsel to the bench. Upon inquiry by the court, appellant proffered that the question was directed toward the witness' credibility. The following then ensued:

1. BY MS. GORFKLE:
Q. Now, let me direct your attention to February 23rd of this year at approximately 2:00 p. m. Do you recall speaking with another investigator and myself in connection with this case?
THE COURT: Miss Gorfkle, this is an improper question. It is improper on two scores.

Firstly, on the basis of the bench conference, it doesn't go to impeaching what the witness said. You only go into a prior statement when you're seeking to impeach a witness' present testimony, and according to what you said at the bench conference, he hasn't testified to that yet.

The second point, Miss Gorfkle, is that you're not permitted to make yourself a witness, and if you ask him questions about what you—what was purportedly said in your presence, it's the same as you're [sic] taking the stand and the canon of ethics doesn't permit you to do that. So I must forbid you from going into that line of questioning.

MS. GORFKLE: Your Honor, may I respond for the record?

THE COURT: What does that have to do with the credibility of the witness?

Miss Gorfkle, I deplore that kind of conduct. That was plainly inflammatory. You do an injustice to yourself and your profession by [currying] to the low passions of the jury and I admonish you if you do that again, I'll find you in contempt of Court, do you understand?

MS. GORFKLE: [Indicating.]

THE COURT: And don't give me that sarcastic look.

MS. GORFKLE: I wasn't giving you a sarcastic look.

THE COURT: Conduct yourself like a professional.

On cross-examination of the complaining witness, appellant, seeking to impeach with a purported prior inconsistent statement, asked whether the witness recalled a conversation with her and her investigator on an earlier date. The court admonished appellant that she was thereby making herself a witness to the alleged conversation, despite appellant's assertion that the question was merely designed to refresh the witness' recollection. The entire colloquy is set out in the margin.[1]

THE COURT: You may approach the bench.
[Thereupon, counsel approached the bench and conferred with the Court, as follows:]
MS. GORFKLE: Your Honor, the witness' testimony was that he doesn't remember but when my investigator spoke with him on February 23rd he did remember, and that's what the impeachment goes to.
THE COURT: What did he remember?
MS. GORFKLE: He remembered that when he noticed his wallet, his wallet was gone at the scene and that—
THE COURT: You've already been into that.
MS. GORFKLE: And that he said that it could have been missing for a period of time.
THE COURT: He's already said that. He said that he doesn't know when it was missing, he's testified to that.
MS. GORFKLE: But what I am saying is that he—is that on February 23rd he did recall when it was missing and that it could have been missing for a period of time.
THE COURT: When did he say that?
MS. GORFKLE: I beg your pardon?
THE COURT: When did he say that it was missing?

During presentation of the defense evidence on the second day of trial, appellant sought an advance ruling from the bench that cross-examination would be limited to the scope of the particular matters into which appellant intended to inquire on direct. The defense theory was that the defendant had run to meet an approaching friend at the very time the complainant shouted that his wallet was missing, and that a nearby police officer apprehended the defendant in the mistaken belief that he was a thief in flight. Appellant therefore sought to elicit the precise sequence and duration of events at the scene, but to do so without giving the prosecution the opportunity to inquire into less helpful matters on cross-examination. The court properly refused to accede to this request to circumscribe the scope of cross-examination in advance.

It was in the context of appellant's unsuccessful effort to obtain an order limiting the scope of cross-examination that her direct examination of one Marlon Dexter Bryant, a witness present at the scene of the alleged crime, occurred. After several preliminary questions, the following exchange took place:

BY MS. GORFKLE:

Q. Now, directing your attention to August 10, 1978, were you in the presence of Mr. Chambers?

> MS. GORFKLE: First of all, he remembered that he patted his pocket.
> THE COURT: You've already been into that.
> MS. GORFKLE: Then he said that it could have been missing for some time at that point.
> THE COURT: He's already said that.
> MS. GORFKLE: I don't believe so.
> THE COURT: I rule that he has.
> MS. GORFKLE: Yes, Your Honor.
> THE COURT: Now, what else do you want to go into.
> MS. GORFKLE: Then I want to go into the pants.
> THE COURT: Pardon me?
> MS. GORFKLE: The pants.
> THE COURT: The tight pants.
> Now, mark my words you're not permitted to ask a question in terms of what was said in your presence.
> MS. GORFKLE: Well, my investigator was there.

A. Yes, I was.

Q. And who else was with you?

A. Man by the name of Mr. Jackson.

Q. What's his first name?

A. Bobby.

Q. And who else was there?

A. And Mr. Brown.

Q. Now, directing your attention to approximately 10:00 p. m. after Mr. Brown had left and returned with some wine—

MR. BIRNEY: Objection, Your Honor.

THE COURT: Sustained. That's rank leading, Miss Gorfkle.

MS. GORFKLE: Your Honor, I am simply laying a foundation to direct the witness' attention.

THE COURT: Yes, but you cannot lead the witness. You can't testify as to facts . . . and put nonleading questions to the witness, Miss Gorfkle.

MS. GORFKLE: Yes, Your Honor, but leading questions are permissible—

THE COURT: Miss Gorfkle, I have ruled, and you are admonished not to lead the witness.

MS. GORFKLE: Yes, Your Honor.

The leading questions continued, however:

BY MS. GORFKLE:

> THE COURT: You may ask the investigator but not that you were present because then you're making yourself a witness.
> MS. GORFKLE: I was just trying to help him recollect the instance.
> THE COURT: No, no, no. Don't try to help him recollect by making yourself a witness.
> MS. GORFKLE: That's the only reason I did that.
> THE COURT: I don't care, you're not to make yourself a witness.
> MS. GORFKLE: Fine.
> THE COURT: Now, that's basic, Miss Gorfkle, that is [a matter] of the [canon] of ethics.
> MS. GORFKLE: Fine, Your Honor.
> THE COURT: Now, please adhere to it, this is your second departure from professional conduct on your part.
> MS. GORFKLE: Yes, Your Honor.

Q. Now, during that evening at approximately 10:00 did there come a time when Mr. Brown left?

A. Yes, there did.

Q. And did he return?

A. Yes, he did.

Q. And what did he return with?

A. A fifth of wine. Wild Irish Rose.

Q. Now, after he returned with the wine, who was there at that time?

A. All of us was still there.

Q. All four of you?

A. Yes.

Q. And what did the four of you do with respect to the wine?

A. We all sat and drank.

Q. And after that, what happened? After the wine was drank did you see anyone else?

A. Yes, there were very few people trafficking up and back and forth.

Q. And did—was Mr. Chambers still there at that time?

A. Yes, he was.

Q. And what happened then with respect to his leaving, if he left?

A. A friend of his had called—

THE COURT: Excuse me, sir, would you please step down by the door.

Counsel, please approach the bench.

At the ensuing bench conference, the court reminded appellant of its admonition and told her quite clearly that another leading question would result in an order of contempt:

THE COURT: You are persistently disregarding my admonition against leading, Miss Gorfkle. One more question of that sort and I will find you in contempt of Court. The question is what happened after he left, if he left. You [have implanted] it in his mind, the leaving is suggestive, that is a leading question and one more question of that type and you are in contempt of Court. Do you understand me?

MS. GORFKLE: Yes, Your Honor. May I respond for the record?

THE COURT: Yes.

MS. GORFKLE: Your Honor, the position of the defense is, No. 1, that it is permissible to ask leading questions as a foundation to direct the witness' attention to a certain time and to a certain event. I am simply trying to direct the witness' attention to the point at which this other person we know as Lum came down the street.

THE COURT: You are not permitted to lead the witness. You can ask perfunctory questions in the leading manner. These aren't perfunctory. Do you understand my admonition?

MS. GORFKLE: I understand the Court's ruling.

THE COURT: One more question of that type and you are in contempt of Court.

MS. GORFKLE: Yes, Your Honor.

It was not long, however, before appellant asked a third leading question, whereupon the court summarily held her in contempt:

BY MS. GORFKLE:

Q. Now, after Mr. Chambers left or as Mr. Chambers left, what, if anything did Mr. Brown do or say?

A. He mentioned something about his wallet was missing.

Q. Do you know what his exact words were?

A. He said, "My wallet is missing," and then he started to search around on the ground, all on the ground, feeling his pockets and what not.

Q. Did you see at that time—did you see anyone else at that time coming up the street?

A. Matter of fact there was. Six or seven dudes coming up the street at that time.

Q. Did you see a police officer?

MR. BIRNEY: Objection, Your Honor.

THE COURT: Sustained.

Ladies and Gentlemen of the jury, it's about time to take the luncheon recess and—excuse me, the mid-morning recess.

Would you please step down, Mr. Bryant? Have a seat in the Courtroom. We'll take a fifteen minute recess.

[The jury left the Courtroom.]

THE COURT: Miss Gorfkle, you have violated my ruling. I admonished you not to lead.

Sir, would you please return to the witness room, Mr. Bryant?

Of course, it's significant to your case to show the time relationship between the defendant leaving and the arrival of the police officer. So you proceeded to ask the witness who had said that he saw six or seven people in the area—six or seven dudes—whether he saw a police officer.

I hold you in contempt of Court. I will fine you $150.

The next question of that type, Miss Gorfkle, will be dealt with more sternly. Do you understand me?

MS. GORFKLE: Yes.

The trial apparently concluded without further incident, resulting in a judgment of acquittal for the defendant. The court issued a written order of contempt on May 22, 1979; imposition of the $150 fine was stayed pending this appeal.

D.C.Code 1973, § 11–944 empowers judges of the Superior Court to "punish for disobedience of an order or for contempt committed in the presence of the court." Super.Ct.Cr.R. 42(a) further states that such a contempt may be punished summarily, that is, without separate notice and hearing, so long as the presiding judge sets out with particularity, in a written order, the bases for his finding of contempt.[2] We have not hesitated to uphold trial judges' reasonable efforts to maintain an orderly and decorous atmosphere in their courtrooms through the use of the summary contempt sanction. Nevertheless, we have recognized that the summary contempt power should be exercised sparingly, especially against attorneys. *See In re Schwartz*, D.C.App., 391 A.2d 278, 281 (1978) (per cu-

riam). In particular, we have held that "[a] contempt conviction ... should not be based on a mere technicality, but should be imposed only where necessary to maintain an orderly system of justice." *In re Hunt*, D.C.App., 367 A.2d 155, 158 (1976) (per curiam), *cert. denied*, 434 U.S. 817, 98 S.Ct. 54, 54 L.Ed.2d 72 (1977). As the Supreme Court has said:

> While we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom, or even from conduct so near to the court as actually to obstruct justice, it is also essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases. An independent judiciary and a vigorous, independent bar are both indispensable parts of our system of justice. * * * [*In re McConnell*, 370 U.S. 230, 236, 82 S.Ct. 1288, 1292, 8 L.Ed.2d 434 (1962).]

*See also Sacher v. United States*, 343 U.S. 1, 12–14, 72 S.Ct. 451, 456–457, 96 L.Ed. 717 (1952).

■ The offense of criminal contempt consists of a contemptuous act and a wrongful state of mind.[3] *In re Farquhar*, 160 U.S.App.D.C. 295, 298, 492 F.2d 561, 564 (1973). Each of these elements must be proved beyond a reasonable doubt. *Parker v. United States*, D.C.App., 373 A.2d 906, 907 (1977) (per curiam); *In re Carter*, D.C. App., 373 A.2d 907, 908–09 (1977); *In re Cogan*, 485 Pa. 273, 281, 401 A.2d 1142, 1146 (1979); *Goldsborough v. State*, 12 Md.App. 346, 358, 278 A.2d 623, 630 (1971); *In re Buehrer*, 50 N.J. 501, 515–16, 236 A.2d 592, 600 (1967). Among those acts which have been found contemptuous are an unexcused failure to make a timely appearance at a scheduled hearing, *e.g., In re Schaeffer*,

2. Rule 42(a) provides that: "A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record."

3. On the other hand, a judgment of civil contempt is remedial in nature and does not require a finding of intent. *See Bolden v. Bolden*, D.C.App., 376 A.2d 430, 432–33 (1977). *See also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949).

D.C.App., 370 A.2d 1362 (1977); *In re Hunt, supra; In re Rosen,* D.C.App., 315 A.2d 151, cert. *denied,* 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974); insulting or improper remarks directed toward the trial judge, *e.g., In re Gates,* D.C.App., 248 A.2d 671 (1968); *Offutt v. United States,* 93 U.S. App.D.C. 148, 208 F.2d 842 (1953), *rev'd on other grounds,* 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954); *Sacher v. United States, supra; In re Buckley,* 10 Cal.3d 237, 110 Cal.Rptr. 121, 514 P.2d 1201 (1973); *MacInnis v. United States,* 191 F.2d 157 (9th Cir.), cert. *denied,* 342 U.S. 953, 72 S.Ct. 628, 96 L.Ed. 708 (1951); persistently asking questions on matters previously ruled inadmissible by the court, *e.g., Offutt v. United States, supra; Hallinan v. United States,* 182 F.2d 880 (9th Cir.), cert. *denied,* 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 1375 (1950); repeatedly putting prejudicial extraneous matter before the jury, *e.g., Hawk v. Superior Court in and for County of Salona,* 42 Cal.App.3d 108, 116 Cal.Rptr. 713, cert. *denied,* 421 U.S. 1012, 95 S.Ct. 2417, 44 L.Ed.2d 680 (1974); persisting in unreasonable objections, *e.g., Sacher v. United States, supra; United States v. Landes,* 97 F.2d 378 (2d Cir. 1938); and disobeying a valid court order or directive, *e.g., In re Ellis,* D.C.App., 264 A.2d 300 (1970); *United States v. Berger,* 145 F.2d 888 (2d Cir.), cert. *denied,* 324 U.S. 848, 65 S.Ct. 685, 89 L.Ed. 1408 (1944). Common to all such behavior is a willful[4] attempt to show disrespect for the court or to disrupt the proceedings. *In re Schwartz, supra* at 281.

■ We are persuaded that appellant's failure to obey the court's admonition against leading did not rise to the level of the contempts committed in the above cases. The two leading questions posed by

appellant after the court's warning did not rise to the level of patent disrespect for the bench[5] and cannot, we think, fairly be said to have disrupted the proceedings. This court's decision in *In re Schwartz, supra,* stands as something of a guiding precedent. In *Schwartz,* the trial court precluded a line of questions as irrelevant and refused to hear appellant counsel's proffer as to their relevance. While we noted that appellant counsel's questioning may indeed have been "somewhat 'tedious,'" 391 A.2d at 282, and his subsequent discussion with the court "a bit too long," *id.* at 281, we held that this behavior was not contumacious:

> Appellant's behavior may have been, to some degree, irritating to the court but we do not perceive his conduct as rising to the level of willful obstruction of the orderly administration of justice or flagrant disrespect for the court so as to sustain a conviction of criminal contempt. While use of the contempt power is sometimes necessary to maintain the orderly administration of justice, it should not be employed indiscriminately. [*Id.* at 282.]

So too, we think appellant Gorfkle's questions, while improper, did not amount to contempt.

■■ In his written order of contempt, the trial judge found as a fact that "[t]he reason for counsel's leading questions stemmed from her desire to limit the scope of the government's cross-examination," and that accordingly, her "persistent failure to adhere to the court's rulings against leading questions constituted a willful and deliberate refusal to comply with the orders of the court." We think that the evidence was also insufficient to support these findings of intent.[6]

---

**4.** "The requisite intent may of course be inferred if a lawyer's conduct discloses a reckless disregard for his professional duty." *Sykes v. United States,* 144 U.S.App.D.C. 53, 55, 444 F.2d 928, 930 (1971).

**5.** As noted *supra,* the record does indicate that earlier in the trial, appellant was reprimanded for giving the trial judge a "sarcastic look." This incident was not recounted in the judge's

order, however, and thus appears not to have contributed to his finding of contempt.

**6.** The judge's order also noted that appellant had "departed from proper norms of professionalism" by asking the question which led to the colloquy detailed in note 1 *supra.* The court was of the view that the question referencing an earlier conversation the witness had had with appellant and her investigator was violative of Disciplinary Rule 5–102 of the Code of Professional Responsibility. This was mis-

First, while it is true that appellant unsuccessfully attempted to secure an advance ruling limiting the scope of the government's cross-examination of Marlon Dexter Bryant, we think it partakes of something like "post hoc, ergo propter hoc" reasoning to conclude that this fact, with nothing more, indicates that appellant's subsequent asking of three leading questions was a deliberate attempt to accomplish tactically what the court refused to do by order. Appellant was hardly quarrelsome in her attempt to obtain the advance ruling, and the judge's contempt order notes nothing objectionable in her demeanor during this stage of the proceedings.[7] Her first leading question—while perhaps aptly described by the court as "rank leading"—did not, we think, evidence a contumacious intent to evade the court's ruling that it would not circumscribe the scope of cross-examination.

■ Second, the court's first admonition against leading came only after this first, "rank" instance. We think that the two later instances hardly amount to a *"persistent* failure to adhere to the court's ruling[ ]" (emphasis added). Absent a pattern of multiple and manifest violations of an order prohibiting leading on direct examination or circumstances showing a clear contumacious intent, we think it would be unreasonable for a trial court to conclude that any given "failure to adhere to" such an order was necessarily intentional or reckless and contemptuous of the court's authority. Leading questions are too often asked out of mere inadvertence or counsel's inability to frame a question artfully during the course of an active colloquy with a witness.

■ The court should, of course, not hesitate to correct or even caution counsel when an improper question is asked. We think a trial court goes too far, however, when it

seeks to insure compliance with its initial warning by threatening counsel with a contempt citation, for as the Supreme Court has stated, "the limits of the power to punish for contempt are the least possible power adequate to the end proposed." *Harris v. United States,* 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965). At stake is not just the professional reputation of counsel, but the rights of his or her client. As one court has observed:

· Unless a lawyer's conduct manifestly transgresses that which is permissible it may not be the subject of charges of contempt. Any other rule would have a chilling effect on the constitutional right to effective representation and advocacy. In any case of doubt the doubt should be resolved in the client's favor so that there will be adequate breathing room for courageous, vigorous, zealous advocacy.

\* \* \* \* \* \*

In applying the generally observed norms of conduct, a judge must make a balanced value judgment case-by-case. This cannot be avoided by a mechanical approach, with ... automatic contempt citations for those who stray across the line. [*People v. Kurz,* 35 Mich.App. 643, 651, 653, 192 N.W.2d 594, 598–99 (1971) (footnotes omitted).]

Although we are by no means critical of the trial judge's laudable concern for the conduct of an orderly trial, and his efforts to exact reasonably high professional standards from counsel, we conclude that in this particular case the judgment must be

*Reversed.*

---

taken. DR 5–102 only requires that counsel withdraw from representing a litigant when he "learns or it is obvious that he ... ought to be called as a witness on behalf of his client." There was nothing improper about appellant's question in itself, and it is far from obvious that her reference to her presence at the earlier conversation necessitated her later testimony. As was said of Canon 19 of the old Canons of Professional Ethics (the predecessor of DR 5–

102), "its purpose [was not] to prevent industrious counsel from investigating causes entrusted to him. There surely should be no great harm in a lawyer knowing something about the subject matter of his law-suit or concerning which he is questioning a witness." *Galarowicz v. Ward,* 119 Utah 611, 619, 230 P.2d 576, 580 (1971).

**7.** *See* note 5 *supra.*